## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

LAUREN MORRIS,

                    Plaintiff,

        v.

CHAD SEHLKE,

                    Defendant.

Case No.

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Lauren Morris, by and through her undersigned counsel, for her Complaint against Defendant Chad Sehlke, alleges, upon personal knowledge and information and belief, as follows:

## INTRODUCTION

1.      At first glance, Chad Sehlke appears to be a catch. He is confident and charismatic. He is the founder of a successful government-contracting company, Sehlke Consulting, LLC ("Sehlke Consulting"). He appears to share his good fortune with his friends and family, bringing them along for the ride as he travels between his homes in different states, and goes to and hosts parties on private yachts. And he comes off as a family man, publicly prioritizing his relationship with his young son.

2.      But this is all just a ruse. In reality, Sehlke is violent, dangerous, and destructive. He is so prone to fits of rage—often fueled by cocaine and alcohol—

that his own friends call him "Mad Chad." Sehlke routinely uses his power to abuse women emotionally, physically, and sexually, as he did here, engaging in cycles of intimate partner violence.

3.    Sehlke's relationships with women follow a pattern. First, Sehlke courts the woman at warp speed. He flirts with her romantically, dotes on her, and introduces her to his social circle. He makes her immediately feel as if she is an integral part of his life. Sehlke then quickly moves in to stake his territory. He jumps into an intense relationship in mere days, all the while professing his strong feelings for the woman. He lulls her into a false sense of security, spinning a tale that this might be true love. This behavior has a name: "love bombing." It is a manipulative tactic of abusers who use these grand gestures to gain control and an upper hand in the relationship.

4.    After the woman lets her guard down, Sehlke takes off the mask. He becomes controlling, punishing her if she dares to leave his side in public. He loses his temper without warning or provocation. Like many domestic abusers, Sehlke mandates that the woman pay attention to him at all times and satisfy all of his demands, no matter how unreasonable. When the woman inevitably fails to meet his impossible standards—by talking to the wrong person at the wrong time or refusing to cater to his every sexual demand—Sehlke uses humiliation and force to get what he wants. As Plaintiff now knows, Sehlke has no qualms about inflicting pain on

the women in his life. He will scream at and degrade them; he will beat, strangle, and/or rape them. And afterwards, he will dismiss, or even openly mock, the pain he has caused.

5.    Sehlke engages in this this cycle of "coercive control" to keep the women dependent on him.  Coercive control "refers to a pattern of abusive behavior perpetrated against intimate partners through threats, rage, orders, and demands to gradually strip away their autonomy, isolate them from systems of social support, and microregulate the day-to-day affairs of their lives."[1] This type of control can lead to "entrapment" and make it extremely difficult for women to leave an abusive relationship.[2]

6.    Plaintiff Lauren Morris was one victim of Sehlke's abuse. Sehlke treated Morris like the woman of his dreams, presenting himself as a driven, self-made professional—the perfect match for Morris, an accomplished lawyer. Once they were in a relationship, he viciously attacked her, strangling her until she couldn't breathe. She thought Sehlke was going to kill her. After this, and other incidents of abuse, Sehlke carried on as if nothing had happened, ignoring the impact of his actions, working instead to further entrap Morris in their relationship by increasing her isolation and emotional dependency.

---

[1] Erin Shelley, *Criminalizing Coercive Control Within the Limits of Due Process*, 70 DUKE L.J. 1321, 1323-1324 (2021).
[2] *See* Tamara L. Kuennen, *Love Matters*, 56 ARIZ. L. REV. 977, 1000, 1010 (2014).

7.     Plaintiff asserts claims against Sehlke for assault, battery, negligent misrepresentation, false imprisonment, and intentional infliction of emotional distress.

## THE PARTIES

8.     Plaintiff Lauren Morris is a resident of Virginia.

9.     Defendant Chad Sehlke is a resident of Collier County, Florida.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the civil action is between citizens of different states and the sum or value of the matter in controversy exceeds $75,000.

11.     This Court has personal jurisdiction over Defendant because he is domiciled in Collier County, Florida, which is in the Middle District of Florida.

12.     Venue is proper in the Middle District of Florida because Defendant resides in Collier County and several of the causes of action accrued in this district.

## FACTUAL ALLEGATIONS

13.     Chad Sehlke is a 40-year-old man who resides in Collier County, Florida. He has been married and divorced four times and has one child.

14.     From February 2002 to June 2012, Sehlke served in the U.S. Marine Corps.   In November 2011, Sehlke founded Sehlke Consulting in Arlington, Virginia. Sehlke Consulting was a professional services and management consulting firm, specializing in Financial Management, Acquisition Management, Logistics

and Supply Chain Management, Digital Transformation, National Security and Defense Programs, and Technology Support Services. Sehlke served as Chief Executive Officer of Sehlke Consulting from its founding until September 2021. In 2021, after Sehlke Consulting merged with Artlin Consulting, LLC, Sehlke became President of a newly formed entity, Aeyon LLC. Similar to Sehlke Consulting, Aeyon provides advanced strategies and digital transformation for critical national security and civilian agency missions. Sehlke left Aeyon in December 2021.

15. Morris is an attorney who lives in Virginia and works at a Washington, D.C. law firm.

16. In July 2021, Morris joined her friends, who were employees at Sehlke Consulting, at a Sehlke Consulting happy hour at an Arlington bar. Sehlke approached Morris at the bar and began flirting with her. Although they had just met and Morris told him that she did not do cocaine, Sehlke did several lines of cocaine in her presence. Sehlke became extremely high and intoxicated, and proceeded to call Morris nonstop after they separated. She eventually had to silence and flip over her phone to sleep that night.

17. The next day, Sehlke texted Morris to apologize and ask her out on a date. She reluctantly agreed, making sure to inform him that night that she did not like that he did cocaine. Their second date took place that night at another Sehlke Consulting happy hour. After that, they became inseparable.

18.     Before she and Sehlke had sex for the first time, Morris asked, as she always did, that they discuss whether either of them had sexually transmitted infections ("STIs"). Sehlke told Morris that he was regularly tested, and that his recent STI test results were negative. Relying on Sehlke's representation about his STI status, Morris agreed to have sex with Sehlke without a condom.

19.     About one week after they first had sex, Morris began to exhibit physical symptoms of a potential STI, which she had never experienced before. Morris told Sehlke that she was going to see a doctor and again asked him if there was any reason for her to be concerned about STIs. He said no.

20.     Shortly thereafter, Morris tested positive for herpes simplex disease ("herpes"). Morris's doctor confirmed that Morris must have contracted herpes from Sehlke, because the infection usually appears within seven to twelve days of contact and Sehlke was her only sexual partner during that window. Sehlke repeatedly denied that he had given Morris an STI, even though he admitted that he had previously been diagnosed with herpes. It was not until days after Morris received her diagnosis that Sehlke finally admitted that he had transmitted herpes to Morris.

21.     Shortly after they started dating, Sehlke and Morris traveled to his house in Michigan, where she first witnessed Sehlke's anger and controlling behavior. Whenever they socialized with his friends, Sehlke wanted Morris to stay

at his side, claiming to have abandonment issues. Morris soon learned that if she strayed from his side, Sehlke would punish her, including by lashing out.

22.    For example, one night after a party at Sehlke's Michigan house, Morris went outside to smoke a cigarette with Sehlke's friends after Sehlke went to bed. While she was outside, Sehlke came downstairs, aggressively ripped the cigarette out of Morris's mouth without saying a word, and walked back upstairs. Sehlke's friends, who witnessed the behavior, told Morris that he lost his temper so often they had nicknamed him "Mad Chad."

23.    Soon after their trip to Michigan, Morris and Sehlke traveled to Colorado to attend a wedding. They arrived in Denver on or around August 19, 2021.

24.    The next evening, they went out to a local bar. While they were at the bar, Morris stepped away to take a phone call from a friend. When she returned, Sehlke complained that she had left him all night; in reality, she had only been gone for a short period of time. They left the bar and headed back to their hotel.

25.    When they arrived at the hotel suite, Sehlke tried to initiate sex by putting his hands in Morris's underwear. Morris was still recovering from a herpes outbreak at the time and was not comfortable having sex, so she asked Sehlke to stop. Sehlke became frustrated, and his aggressive behavior made Morris even more uncomfortable. Morris separated herself from Sehlke and went into the bathroom to get some space.

26.    While Morris was in the bathroom, she heard Sehlke get angrier and lose control entirely. He stormed around the hotel room, yelling obscenities.

27.    Morris eventually left the bathroom and sat on the bed, holding her knees to her chest. Sehlke put his arms around her, but she pushed him away.

28.    Sehlke then jumped up, lunged at Morris, and started choking her, causing Morris to fall onto her back. Sehlke continued to choke Morris for approximately three to five seconds, screaming at her as he held his hand around her neck. Morris could not breathe and was terrified. Finally, Sehlke let go of Morris's neck and she gasped for air.

29.    Still lying on her back in shock, Morris started apologizing in an attempt to calm Sehlke down. He continued yelling at her. Morris stood up, shaking and crying, and tried to get away from Sehlke as quickly as she could. She started to pack her belongings while Sehlke followed her around the hotel suite, screaming at her to get out and stomping his feet.

30.    Morris eventually made it to the bathroom and closed the door. Sehlke, who was standing outside of the bathroom, started to throw objects around the suite. He threw Morris's phone down the hallway, where it hit the door to the suite. Sehlke continued screaming at Morris from directly behind the bathroom door. Morris was trapped in the bathroom.

31.    When Morris eventually opened the bathroom door, Sehlke aggressively approached her again, still yelling. He cornered Morris in the bathroom, blocking the exit. Fearing for her life, Morris shoved Sehlke through the bathroom's open doorway and back against the wall, scratching his neck in the process. She then quickly left the hallway to retrieve her suitcase and leave the suite.

32.    After a brief phone call, during which Sehlke asked her whether she had called the police, Morris later returned to the suite. She and Sehlke continued the weekend together, agreeing to discuss what he had done once they returned to Virginia. Morris hoped Sehlke would take responsibility and work on controlling his rage. Morris did not tell anyone about the attack immediately after it happened—she did not want to create a distraction at her friend's wedding that weekend and did not want her friends or family to think negatively of Sehlke if their relationship recovered.

33.    Sehlke's next attack on Morris took place in September 2021.  Morris joined Sehlke at his Florida home, where he was having a party to celebrate the pending merger between Sehlke Consulting and Artlin Consulting.

34.    Morris was outside with a group of Sehlke's friends when Sehlke, who had been drinking all day, came outside and began berating Morris, calling her a bitch and telling her to burn in hell, among other things. Morris asked Sehlke if he was going to abuse her again, referring to the Denver attack, and he began to walk

toward her aggressively. Sehlke's friends quickly intercepted, pulling him into the house, but Sehlke threw his drink at Morris, striking her in the back. Two of Sehlke's friends stayed outside with Morris, trying to console her as she began shaking and crying.

35.    Sehlke and Morris eventually talked about his outburst, with the assistance of Sehlke's uncle and friend playing the role of mediators. Morris agreed to continue her relationship with Sehlke if he sought treatment for his anger management issues and joined her in couples therapy. Sehlke promised he would change for the better.

36.    That promise never materialized. Less than two weeks later, while in Michigan, Sehlke slapped Morris across the face while they were having sex. Morris stopped their sexual encounter after Sehlke slapped her.

37.    The day after he slapped her, Sehlke abruptly told Morris that he was leaving for a trip with friends, and Morris returned to Virginia. After Morris arrived in Virginia, Sehlke asked her to send him an email listing the reasons that they should stay together. Morris thought this was a strange request; however, she and Sehlke had attempted to resolve prior conflicts by writing to one another rather than speaking. She believed he was going to send her a reciprocal email as part of an effort to improve their relationship, so she agreed and sent the email as requested. Sehlke never responded and ended the relationship soon thereafter.

38.    Morris sought therapy to process the abuse Sehlke had inflicted on her. She was treated for PTSD, as well as daily panic attacks.

39.    Morris ultimately had to take medical leave from her job for a month, under her doctor's instruction, to receive treatment for PTSD and anxiety. When Morris returned to work, she was still experiencing panic attacks and other symptoms of PTSD. She struggled to manage the grueling workload of a lawyer.

40.    In addition, Morris continued to experience intermittent pain in her jawline, which started after Sehlke choked her in Denver. Morris's jaw pain continues to this day. Her primary care doctor concluded that Morris's jaw pain is consistent with damage to her temporomandibular joint ("TMJ") caused by Sehlke's strangulation of Morris. Additionally, Morris's most recent dental visit revealed multiple teeth fractures that had not been evident at her last visit, which had taken place prior to her involvement with Sehlke.

## CLAIMS
## COUNT I – BATTERY

41.    Morris incorporates by reference paragraphs 1-40 above and re-alleges them as if set forth fully herein.

42.    Sehlke inappropriately touched Morris with the intent to harm or offend her when he had sexual intercourse with her without a condom, when he knew that he had an STI and Morris did not know that he had an STI.

43.     Morris specifically asked Sehlke if he carried an STI. Sehlke told her that he did not.

44.     Morris was harmed and offended by the inappropriate and wrongful touching, including by contracting an incurable disease.

45.     Sehlke's harm caused Morris lasting physical injury and was a substantial factor in causing the substantial harm that Morris has suffered and continues to suffer.

46.     As a direct and proximate result of Sehlke's conduct, Morris suffered injuries which include, but are not limited to, great bodily harm and resulting pain and suffering, disability, lost wages, lost earning capacity, mental anguish, loss of capacity for the enjoyment of life, medical treatment, medical expenses, and all other damages to which Morris may be entitled to recover under applicable law. These injuries and losses are permanent and continuing, and Morris will suffer these losses in the future.

47.     Accordingly, Morris is entitled to recovery against Sehlke in an amount to be determined at trial.

## COUNT II – FRAUD AND MISREPRESENTATION

48.     Morris incorporates by reference paragraphs 1-40 above and re-alleges them as if set forth fully herein.

49.     Sehlke made a material misrepresentation to Morris that he did not carry any STI when Morris specifically asked Sehlke if he carried any STI.

50.     Sehlke knew this representation was false, as he later told Morris that he had previously been diagnosed with herpes.

51.     Sehlke intended for Morris to rely on this representation, and she did, when choosing to have sex without a condom, and they in fact had sex without a condom as a result of this representation.

52.     Morris was harmed by Sehlke's representation, including by contracting an incurable disease.

53.     Sehlke's harm caused Morris lasting physical injury and was a substantial factor in causing the substantial harm that Morris has suffered and continues to suffer.

54.     As a direct and proximate result of Sehlke's conduct, Morris suffered injuries which include, but are not limited to, great bodily harm and resulting pain and suffering, disability, lost wages, lost earning capacity, mental anguish, loss of capacity for the enjoyment of life, medical treatment, medical expenses, and all other damages to which Morris may be entitled to recover under applicable law.  These

injuries and losses are permanent and continuing, and Morris will suffer these losses in the future.

55.    Accordingly, Morris is entitled to recovery against Sehlke in an amount to be determined at trial.

## COUNT III - BATTERY

56.    Morris incorporates by reference paragraphs 1-40 above and re-alleges them as if set forth fully herein.

57.    Sehlke intentionally and inappropriately touched Morris with the intent to harm or offend her in August 2021, in Colorado, when he lunged at Morris and choked her neck, impeding her breathing and/or circulation of blood.

58.    Sehlke also inappropriately touched Morris with the intent to harm or offend her in or around September 2021, in Florida, when he threw his drink at her, striking her in the back, before being physically separated from her by witnesses.

59.    Sehlke also inappropriately touched Morris with the intent to harm or offend her in or around September 2021, in Michigan, when he slapped her across the face.

60.    Morris did not consent to the inappropriate touching.

61.    Morris was harmed and offended by the unwanted touching.

62.     Sehlke's actions caused Morris great bodily harm and were a substantial factor in causing the substantial harm that Morris has suffered and continues to suffer, including great bodily harm and permanent disability.

63.     As a direct and proximate result of Sehlke's conduct, Morris suffered injuries which include, but are not limited to, great bodily harm and resulting pain and suffering, disability, lost wages, lost earning capacity, mental anguish, loss of capacity for the enjoyment of life, medical treatment, medical expenses, and all other damages to which Morris may be entitled to recover under applicable law. These injuries and losses are permanent and continuing, and Morris will suffer these losses in the future.

64.     Accordingly, Morris is entitled to recovery against Sehlke in an amount to be determined at trial.

## COUNT IV - ASSAULT

65.     Morris incorporates by reference paragraphs 1-40 above and re-alleges them as if set forth fully herein.

66.     Sehlke acted with intent to touch Morris in a harmful or offensive manner, which created a reasonable fear of imminent peril or offensive contact.

67.     In August 2021, in Colorado, Sehlke lunged at Morris and choked her neck, impeding her breathing and/or circulation of blood. He screamed at her, chased

her around the hotel room, and repeatedly approached her, causing her to fear that he was going to kill her.

68.    In September 2021, in Florida, Sehlke approached Morris aggressively and screamed at her. He threw his drink at her, striking her on the back, before being physically separated from her by witnesses

69.    In September 2021, in Michigan, Sehlke slapped Morris across the face.

70.    At no time did Morris consent to Sehlke's conduct, and she was harmed by and as a result of it.

71.    Sehlke's actions caused Morris great bodily harm and were a substantial factor in causing the substantial harm that Morris has suffered and continues to suffer, including great bodily harm and permanent disability.

72.    As a direct and proximate result of Sehlke's conduct, Morris suffered injuries which include, but are not limited to, great bodily harm and resulting pain and suffering, disability, lost wages, lost earning capacity, mental anguish, loss of capacity for the enjoyment of life, medical treatment, medical expenses, and all other damages to which Morris may be entitled to recover under applicable law.  These injuries and losses are permanent and continuing, and Morris will suffer these losses in the future.

73.    Accordingly, Morris is entitled to recovery against Sehlke in an amount to be determined at trial.

## COUNT V – FALSE IMPRISONMENT

74.    Morris incorporates by reference paragraphs 1-40 above and re-alleges them as if set forth fully herein.

75.    Sehlke intentionally confined Morris, depriving her of her freedom of movement by use of force.

76.    In August 2021, in Colorado, Sehlke physically prevented Morris from leaving the bathroom in the hotel room by standing in front of the bathroom and throwing items around the room and yelling, such that Morris believed if she left the bathroom, Sehlke would harm her. Sehlke's actions preventing Morris from leaving the bathroom at that time were intentional.

77.    Morris did not voluntarily consent to stay in the bathroom. She was conscious of her confinement and wanted to leave, but believed that if she left the bathroom, Sehlke would harm her.

78.    Sehlke also confined Morris when he lunged at Morris and choked her, such that Morris could not escape his grasp. Morris did not consent to being pinned down by Sehlke. She was conscious of her confinement and wanted to escape, but could not escape Sehlke's grasp.

79.    Sehlke's actions caused Morris physical injury and were a substantial factor in causing the substantial harm that Morris has suffered and continues to suffer.

80.    As a direct and proximate result of Sehlke's conduct, Morris suffered injuries which include, but are not limited to, great bodily harm and resulting pain and suffering, disability, lost wages, lost earning capacity, mental anguish, loss of capacity for the enjoyment of life, medical treatment, medical expenses, and all other damages to which Morris may be entitled to recover under applicable law. These injuries and losses are permanent and continuing, and Morris will suffer these losses in the future.

81.    Accordingly, Morris is entitled to recovery against Sehlke in an amount to be determined at trial.

**COUNT VI- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

82.    Morris incorporates by reference paragraphs 1-40 above and re-alleges them as if set forth fully herein.

83.    Sehlke intentionally engaged in extreme and outrageous conduct around July 2021 by transmitting to Morris an incurable STI after he materially misrepresented to Morris that he was not carrying any STI.

84.    Sehlke furthered engaged in extreme and outrageous conduct in August 2021 by attacking and choking Morris in Colorado, and by chasing her around the room such that she was forced to go into the bathroom to escape.

85.    Sehlke further engaged in extreme and outrageous conduct by attacking Morris at his Florida residence and throwing a drink on her in September 2021.

86.    Sehlke further engaged in extreme and outrageous conduct by slapping Morris across the face at his Michigan residence in September 2021.

87.    As a result of Sehlke's extreme and outrageous conduct, Morris suffered severe emotional distress that no reasonable person could be expected to endure.

88.    As a direct and proximate result of Sehlke's conduct, Morris suffered injuries which include, but are not limited to, great bodily harm and resulting pain and suffering, disability, lost wages, lost earning capacity, mental anguish, loss of capacity for the enjoyment of life, medical treatment, medical expenses, and all other damages to which Morris may be entitled to recover under applicable law.  These injuries and losses are permanent and continuing, and Morris will suffer these losses in the future.

89.    Accordingly, Morris is entitled to recovery against Sehlke in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial in this action for all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court award:

    i.    Actual, compensatory damages;

    ii.    Statutory damages;

    iii.    Punitive damages;

iv.    Attorneys' fees;

v.     Pre- and post-judgment interest, costs; and

vi.    Any such other and further relief as this Court may deem just

       and proper.

Dated: New York, New York
August 19, 2022

Roberta A. Kaplan (NY #2507093)*
Julie E. Fink (NY #4452553)*
Shawn G. Crowley (NY #5019195)*
Kyla Magun (NY # 5626635)*
Rachel Tuchman (NY # 5594650)*

KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
jfink@kaplanhecker.com
scrowley@kaplanhecker.com
kmagun@kaplanhecker.com
rtuchman@kaplanhecker.com

Stephen F. Rosenthal
Florida Bar No. 131458
Christina H. Martinez
Florida Bar No. 1029432

PODHURST ORSECK, P.A.
SunTrust International Center
One Southeast 3rd Avenue, Suite 2300
Miami, Florida 33131
(305) 358-2800
srosenthal@podhurst.com
cmartinez@podhurst.com

*Attorneys for Plaintiffs*

*\*pro hac vice forthcoming*